Good morning. May it please the Court. My name is Shane Harvey. I'm here on behalf of Fola Coal Company. The question before this Court is whether Fola has violated the terms of its Clean Water Act discharge permit, also known as an NPDES permit. The permit was issued in 2009 by the State of West Virginia. West Virginia elected, in its discretion, not to impose limits for conductivity in Fola's permit, even though Fola expressly disclosed that its discharges would contain elevated levels of that parameter. Neither EPA nor OVAC objected to Fola's permit. Two years later, however, EPA published new research suggesting that something in conductivity causes adverse effects to certain very sensitive aquatic insects. After that, EPA and OVAC began to insist that permits being issued in West Virginia contain conductivity limits. West Virginia disagreed. They also faced some disagreement from Kentucky. And after a lot of litigation, neither EPA nor OVAC gained any traction in its desire for conductivity limits in West Virginia. I don't mean to interrupt you, but I do want to know whether the permit had a numerical water quality measure in it. It did have numeric limits in it, Your Honor, for many parameters, but not conductivity. So conductivity was not affluent? No, Your Honor. There was no specific limit on conductivity. So when was this standard ascertained? Was it ascertained at trial, or did Fola know in advance what the standard was? It was ascertained at trial, Your Honor, that Fola had to meet some certain conductivity limit, specifically a limit of 300 microsiemens per centimeter. But in the contract, I mean in the permit, you were required to maintain water quality. We disagree, Your Honor, that that's what the permit requires. If the permit did require that, I'm sure you'll be talking about that, if you were on notice of that requirement to maintain water quality. If it required that, and our view is that under this Court's decision in Piney Run, that if the permit holder is shielded for any pollutants it discloses, as long as it complies with its effluent limits, unless the contract, the permit, specifically bans that pollutant. You're saying that you're not required to maintain water quality. Aren't you, in fact, required to do so, but the method by which you do it is by complying with the express limitations of effluents in that first part of the permit that the agency in its discretion and expertise has indicated that's what needs to be done in order to comply with water standards? That's exactly what we're saying, Your Honor. That is how compliance is ensured. Permit holders are given express numeric limits. They must monitor their discharges. If they exceed those limits, there can be enforcement. But permit holders are not broadly required to meet water quality standards. That is our position. Well, and where do you get that idea? Again, from this Court's decision in Piney Run. Piney Run said that the shield applies to you if you comply with the terms of the permit. It says, Your Honor, that the shield applies to you if you disclose your pollutants  No, it doesn't say that. It says an NDS permit holder is shielded from CWA liability for discharges in compliance with its permit and is liable for any discharges not in compliance with its permit. Correct, Your Honor. And the provision that the Court pointed to to found that we were not complying with our permit is a provision in the permit that references a rule, Rule 5.1.F, and I think Your Honor alluded to it. That rule provides in the passive voice, Discharges are to be of such a quality so as not to cause a violation of water quality standards. This provision does not provide any guidance on how discharges are to be measured or how this requirement is to be met or by whom. In that sense, it is very, very similar to the provision at issue in Piney Run. No, it's not at all. In Piney Run, the provision is very different because under Piney Run, first of all, the state agency clearly in the Piney Run statute is required to set these standards and that's not the case here. The beginning of this section says that these things are violations. Do I have to get it out? I'm familiar with it, Your Honor, but which section are you talking about? Which language is, right? Yes, I am very familiar with it. I'm not sure. It's really not the same as Piney Run. Piney Run just didn't have a clause like this in the plan. Your Honor, in the Piney Run situation, the permit had a footnote that says the discharges of pollutants not shown shall be illegal. And the argument in that case was that because the pollutant, in that case heat, was not shown that it was illegal. And Judge King read that provision and said that is ambiguous. It doesn't tell us to whom or where the pollutants shall be shown. And our position is that in this case, the provision is at least as ambiguous. It simply says discharges are to be of such a quality so as not to cause a violation of water quality standards. It does not say who must meet that requirement. It's in the provision which talks about requirements, right? It is. That you must make to make the permit, to get the permit, right? It does. It is. It is. There are a series of conditions that are incorporated into the permit. I think there are 19 different rules in all that are incorporated. Many of those rules don't require the permittee to do anything. Many of them simply explain how the permit operates. There are provisions that say the permit may be modified. There are provisions that say the permit does not create any property rights. That does not command the permit holder to do anything. In our view, this provision is the same. How do you distinguish the circuit cases that were cited in the amicus briefs that indicate that these kinds of standards are, in fact, enforced all the time? There are a handful of cases. Only one is a circuit case, the Ninth Circuit case out of the City of Portland. Others are district court cases, I believe. Perhaps the City of Los Angeles case is also a Ninth Circuit case. Those cases are different in a couple of ways, Your Honor. First, the provisions in those cases, we would argue, are more specific than the provision at issue here. For instance, in the City of Portland case, the condition issue said something to the effect of notwithstanding compliance with effluent limits, you must comply with water quality standards. We don't have anything that's specific here. But the biggest difference with those other cases is that in those cases the state did not step forward and say, this is not what the provision means. Here the court has that. The court has asked for the state's provision. The state will speak to that today. And the state is adamant that this provision does not mean what Judge Chambers found it to mean. In fact, I think to correct any misconception going forward, didn't it eliminate that phrase from the regulation going forward? It has eliminated it going forward, which I think is crystal clear evidence of what the state's intent is. But it has to get permission from the EPA if this is part of the permit. And it's asked for that permission and hasn't been given it. It is awaiting permission, Your Honor. The recent filings indicate it's not going to get it. I don't know that that's true. I don't know that it's true in the future, but the recent filings indicate that. That's true because we have them. Yes, Your Honor. I think what is going on now between EPA and the state is a series of questions from EPA that the state still has yet to answer about what will be the effect of removing this provision. I don't think the EPA can ultimately disapprove the removal of this provision because the EPA doesn't require such a provision itself. There are a list of standard conditions that every permit must contain. EPA does not require this of a state, so I don't know that the EPA can ultimately say the state can't take it out of its permits. Are you done? It appears I'm done, Yes, Your Honor. Thank you. I guess you all have divided your time. Judge Motzen, may it please the Court, Tom Johnson for the State of West Virginia and Department of Environmental Protection. Judge Motzen, I think you're correct to focus here on the text of the permit in this case. Several indications show that the interpretation adopted by both parties to this permit in this case, FOLA and DEP, in which FOLA is not required to limit discharges on conductivity, is supported by that text and structure. Looking at Section A, each outlet in FOLA's property after an administrative process in which DEP exercised its technical expertise is accompanied by specific pollution limits, sampling requirements, reporting requirements, a schedule for sampling. And then Section D refers back to Section A explicitly and states that DEP will monitor those samples and determine on a periodic basis, ongoing basis, whether the specific effluent limits in Section A are sufficient to meet state water quality standards. My question is whether FOLA would know at the outset what water quality standards they were to meet. Is that present in the permit anywhere? Your Honor, yes. In Section A, the specific effluent limits that DEP determined were sufficient in 2009 to meet water quality standards, for example, a limit on iron discharge, aluminum discharge, those all appear very specifically along with reporting requirements, specific chemical limits, all in Section A of the permit. And then Section D says that if the state, DEP, later determines that those specific effluent limits are insufficient to meet state water quality standards, then DEP has discretion to modify or reopen the permit. But they never did that in this case. They never went back and changed the status. Is that right? That's correct, Your Honor. They did not exercise that discretion in this case. What about this 2011 case? Absolutely, Your Honor. All right. In that case, you said that this section was a part of the permit. Your Honor, in the Consol case, this was a complaint that was brought by EPA. Right. And DEP moved to intervene, asserting the same claims, two of the same claims that DEP, excuse me, that EPA had asserted in that complaint. In order for DEP, as a co-regulator of this stream, to participate in the consent decree in that case. But there was no dispute, Your Honor, that Consol had violated the specific chloride effluent limits in its permit. With respect to one of the issues, on one of the mines, the permit, this is your complaint, the permit, as modified, did not include numeric limits for chloride. And therefore, you asserted that there was still a violation of the act because this section, which is in question now, providing that the discharges or discharges covered by the NGCS permit are to be of such quality so as not to cause violation of applicable air quality standards. That was the only way, that was the only basis for your claim against that part of the Blackfield No. 2 mine. I would need to take a look at that specific outlet, Your Honor. Do you really doubt that I'm reading you something? No, I'm not, Your Honor. I'm making it up. I'm not, Your Honor. And you're repeating, right? You know, I represented the state of Maryland for a long time, and I know there are a bunch of different lawyers, but, you know, you're all the same as far as we're concerned. I think that's correct, Your Honor. What I would say, though, is that under this Court's precedent, the positions that are taken by agency counsel litigation are not typically accorded deference where they conflict with the position of the agency as set forth, for example, in opinion letters. That's the Ritter case that's cited both by OBEC and by NGCS. But you can't change the provisions in the permit by changing your own position. That can't be. You have to have a – that just can't be because you have to get EPA approval. So if in 2011 this was a provision in the permit, it's still a provision in the permit until you get EPA permission to remove it. That is correct, Your Honor. It is still a provision in the permit. The way in which the state has, in reasoned policy determinations, in a series of letters to FOLA, OBEC, and EPA, interpreted that provision is consistent with EPA's guidance on the extent of the permit shield and the way that that was applied by this Court's opinion in Piney Run. And the way that DEP interpreted that case was that unless there was a specific effluent limit in the permit, that the permittee was shielded with respect to disclosures that were made during the permit application process but not actually translated. So you would agree with me that there was no provision in the Piney Run permit that is like the provision that is issued here? Not exactly, Your Honor. There was not at all? Well, Your Honor, I think the mode of analysis in Piney Run is what's important. There was a provision that the plaintiff bringing that citizen suit hung its hat on in determining why it thought that heat was prohibited as a discharge in that case. And it was a provision that said discharge of any pollutants not shown shall be illegal. And that was interpreted as Judge King interpreted that language. But that's not the language here. That's correct, Your Honor. But again, the mode of analysis is that that language was deemed ambiguous, and then the choice among competing interpretations was informed by the Court's interpretation of the permit shield. When was this provision that's at issue here first put into the permit? I believe in the mid-1980s, Your Honor. And in that case, when EPA approved that, it indicated that it was not intended to affect the rights or obligations of the permittees. And that supports. And what was the origin of that legislation? I don't know, Your Honor, in terms of the specific. Wasn't it a combination of the environmental laws and the laws that deal with the mines, and they were placed together into one consolidated statute? And in the previous statute, you make a good deal of this in your brief, and you say, well, this is a new thing that came up, and it was a new change in the law then. If it's a change in the law and EPA didn't say it was a change in the law, so it's okay. But it wasn't a change in the law because it had been in those provisions of West Virginia law that dealt with the mines. Isn't that correct? I trust your representation on that, Your Honor. I was very surprised that the state would make that argument in its case, that this was new, because it seems to me it's a powerful argument. If out of the blue West Virginia had put this in the law and EPA hadn't said that there was any change in the law, but they didn't. It wasn't out of the blue. Well, Your Honor, the provision has been around for a long time. I think what's new here is the way in which it has been used to impose specific numeric limits that were not contemplated in 2009. But what did it mean exactly in the case that you joined, because there was a consent decree in which you got relief, and you wouldn't have gotten relief with respect to that mine without the quality standards provision? Because there was no permit modified to include numeric limits for chloride for outlet 1005. That's what you said in your complaint. I think that's correct. Well, Your Honor, at best what that introduces is ambiguity in terms of the agency's interpretation. Again, we think that the interpretation contained in the policy letters under Ritter has afforded additional deference. But even if you disagree with that, Your Honor, the court's mode of analysis in Piney Run would suggest at best there's ambiguity, and the interpretation that ought to be adopted is the one that gives full effect to the permit shield that FOLA relied on when it made its application in 2009. Thank you. Mr. Lovett, perhaps you're going to address Piney Run. So I think, yes, Your Honor, it's Joe Lovett on behalf of the Ohio Valley Environmental Coalition, West Virginia Highlands Conservancy, and the Sierra Club. I think that Piney Run makes clear that the permit shield is a red herring in this case. It's really not applicable. If FOLA is complying with all the terms of its permit, then it is in fact shielded. If it's not, then it's not. We're arguing that it doesn't comply with all the terms of its permit, namely this term about compliance with water quality standard. And if we're right about that, then the permit shield is not applicable. Well, you heard the argument that was just made, and I guess that's what we'd like you to address, or at least I would. Yes. If you can. The Piney Run argument? The Piney Run argument, the relying on the language that Judge King relied on at Piney Run and the suggestion that it's very much like the language that's at issue here. Yes. So in this case, yes, Your Honor. Let me start, if I could, in answering that question, to go to Judge Lee's question and then get to this. So I think Judge Lee's question has been, did FOLA know in advance what condition was in its permit? And the answer is clearly yes. This condition has been in permits since the 80s. And it's important to understand that clean water ---- A numerical standard contained in the complaint? It seems to me that a trial took place and the standard was determined by the judge. I'm not sure how FOLA could know in advance what the standard was, if it had to have a five-day trial to figure out what it was. No, I don't. So I think that the standard was not determined by the judge, but what compliance with the standard is. The water quality standard is very clear. It's a narrative standard, and it says you have to comply. With water quality standards. I'm fine with that. But the numerical score, he came up with at trial, was a result of expert testimony. It was. How in the world could FOLA know about that in advance to find out that they were complying or not complying with the permit? FOLA is known for a long time. This has been a live issue for many years about what level of conductivity causes violations of water quality standards or biological impairment. When this permit was issued, it had been a hot issue for a long time in the regulatory world. But I don't think that answers the question of who determined in advance and how this operator would have known in advance what the standard was. And what you said earlier seemed a bit circular. You have to comply with water quality standards, and you do that by complying with water quality standards. What does that mean? You comply with a narrative water quality standard by not causing biological impairment. That's the standard. All states know how to measure biological impairment. They're measured with insect stream condition indices, in this case the West Virginia Stream Condition Index. That index has been used in West Virginia and approved by EPA for more than a decade to determine impairment. FOLA knows how to do a stream condition index. It does it all the time. The state knows how to do it. In fact, that's the method that the state uses to say that a stream is impaired and put it on the 303D list. Why wouldn't that appear in Part A of the permit as opposed to this broad standard that seems to almost subsume and basically says it doesn't matter what limitations were placed with respect to effluence in Part A. You've got to comply with this broader requirement. It eliminates the specific limitations that the operator was given specific notice of in the first part of the permit. Well, they're different provisions. Certainly, the numerical criteria are set. They're fixed. Those criteria generally keep streams well above their water quality standards. They're pretty strict, right? But there's a floor. That floor is you can't violate water quality standards. You can't kill the aquatic life that makes it necessary to comply with the Clean Water Act. It's a floor placed in not only this permit, but permits by EPA, other states to assure that if those numerical criteria aren't sufficient, then the floor isn't breached by other pollutants. So Section C contains a boilerplate cross-reference with 19 rules with 80 subparts. Yes. And somewhere in there is this numerical standard we're talking about. Well, the numerical standard itself is, okay, so there isn't a numerical standard at issue here. There is a narrative standard. Narrative standards are just as important. But ultimately, at trial, the judge determined that a score above 68 for Outlet 29 was a violation, correct? He determined that, yes. Okay, so that's the West Virginia stream. At trial. Yes, so that's the stream condition index. We have known, and everybody in West Virginia knows, that any time a stream goes below that score, it's in violation of the narrative standard. That's why it took five expert witnesses in a five-day trial? No, it took five expert witnesses to show that the conductivity was causing that impairment. There's no question that when you reach that level, the stream is impaired. That's how West Virginia places streams on the impaired stream list and how EPA understands what streams are impaired. That is a number that has been around forever, and there is no controversy, I believe, that when you exceed that number, or when you go below that number, the stream is impaired and in violation of the water quality standards. I don't think that's an issue here. I think we know what a violation is. They fudge around about they say it's 62 or 60. Okay, that's a technical issue. EPA says it's 68. They say it's 62. Here it doesn't matter. Because it was below both of those. Because it's below both of those. But there's no question, it is 68. EPA said it. The court determined it. But regardless, we know that. We know how to measure that. Everybody knows how to measure it. Companies do it all the time. The state does it. EPA does it. They knew when they got their permit that if the stream condition index dropped below 68, that they were in violation of their permit. They knew it. The question at trial was, what caused it and how do you remedy that? Okay, so they knew and that standard has been in effect for a long time. But there's no question. They did not exceed their effluent discharge limits. There was no proof of that. Is that right? That's correct. But narrative water quality standards are just as important to the permit as the numerical criteria are. They're equally important to a permit. It's not right just to dismiss something because it doesn't have a numerical criterion associated with it. Why isn't that a national requirement then, or is it? That the imposition of a standard water quality standard? Well, because there are standards that when there are times. Why are there provisions like this? Yeah. Okay, so EPA is in the process of developing a water quality standard for conductivity right now. It takes a while. No, I think we're asking a simpler question than that. Here it talks about water quality standards either in the permit or not in the permit. But, you know, we're debating that. But let's just for purposes say in the permit. It seems in other permits, for example, the one that King decided, there was no such provision. Why is that? There was no such provision. This provision is in every mining permit in West Virginia. No, it's the mining. Okay, it's not in other permits. But is it in every mining permit in every state? It's not, but it's in many states. But what's important, so it's in every mining permit in West Virginia. Many states use it, and it's important. If you read EPA's letter, I think, recently objecting to a permit, EPA was very clear that this is an important part of these permits, and it's necessary to comply with water quality standards. Then it would be backsliding to remove it, and that's illegal under the Clean Water Act. So EPA sees that. And EPA, so here's an important point for us. EPA used that as an objection to a state-issued permit. If this court were to determine that that provision isn't valid here, EPA wouldn't be able to object to permits in West Virginia based on this. The state wouldn't be able to sue operators based on this, as it has on at least two occasions. And EPA wouldn't be able to do it in other states in the Fourth Circuit and maybe beyond. This is a well-established practice. EPA's letter objecting to the Mingo-Logan permit that we sent to you recently makes that clear. Really what makes it clear, too, is that DEP knows that DEP, on at least two occasions itself, has brought enforcement actions based on violations of this very provision, once for a selenium violation and then once, as Judge Motz pointed out, against this very company's parent, Consol, for violating the standard at issue here. EPA did the same thing. It's really, there's nothing unusual about this. It happens in many contexts. I understood the other side's argument in part as being focused on the particular language of this permit and the ambiguity inherent in the direction given to the permittee as opposed to the agency. Sure. Okay, let me address that. So I have the permit in front of me, and the permit on its first page says, the operation will discharge treated water into Road Fork and Leatherwood. It explains what it's going to do, and it says, the affluent limitations, monitoring requirements, and other conditions set forth in sections A, B, C, and D. Not just A, okay? So that says other conditions are set forth there. When you turn to the permit C, as I'm sure you've done, it says terms and conditions, okay, conditions. It's clear, and with that is this duty to comply with 5.1, the regulations. When you turn to 47 CSR, which is a state regulation, 30.5, 30-5, it says conditions applicable to all permits. Again, the word conditions. And it says in the first and the second sentence, all conditions shall be incorporated into West Virginia permits either expressly or by reference. It's exactly what happened here, incorporated by reference. 5.1a says the permittee must comply with all conditions of its West Virginia NPDES permit. Permit noncompliance constitutes a violation of the Clean Water Act and is grounds for enforcement action. So it really couldn't be clearer that this is incorporated, a requirement incorporated into the permit. So then here, the state is selectively taking positions on this Clean Water Act standard. Because in this case, they've taken a position that there's no violation. Yes, the state's just wrong about that. It's not only wrong, it's hypocritical. It's used this very provision to enforce against other companies in other contexts. And, you know, the provision itself is very important. And it's not, I disagree that it's ambiguous or even passive for that matter. It's pretty clear. It may be a bit wordy, but it's clear that this applies to permits, to discharges. The only discharger here is the company. So the state can monitor the stream. The state can change the standards as they go along. And I suspect that what happened here is that your group was able to monitor the stream better than the state and better than FOLA. And you came up with the violation, correct? Well, sort of. FOLA does monitor the stream. You wouldn't know it from the brief, but FOLA does monitor the stream under SMACRA, under the Surface Mining Law. Okay? So it monitors the stream and has high conductivity. That's how we knew about it. We knew about it because they were monitoring it themselves, not under the Clean Water Act, but under SMACRA. So they were monitoring. They knew it. They knew what the stream condition index was. It wasn't any great discovery of ours. We just looked at what they were turning into the state of West Virginia. Mr. Lovett, could a permit simply say the operator shall comply with all applicable water quality standards and leave it at that, without identifying any specific affluence and party of a permit? Would that be enough? Yes, it is a condition. If it's a condition of a permit, then it's yes, absolutely. And that is a condition. Isn't that at all troubling in terms of giving notice to the operator as to what it's supposed to regulate? No, because the operator knows that it can't discharge any material in concentrations sufficient to lead to a violation of the narrative water quality standards. Somebody has to identify those standards, and you say they've been well identified. The whiskey scores, they're called VASCE in Virginia. Whiskey is the Virginia stream condition index, the West Virginia stream condition index. They're all stream condition indices. The agency has rejected that as a proper index. Well, West Virginia has. Let me finish my question. I'm sorry. Isn't that their prerogative as the so-called expert? It is not. EPA must approve it. They must submit it to EPA for approval. They've done so. EPA has not approved it. And EPA will not approve that. And EPA has written letters to the states. It can't approve it because all, now this is something that is in all states as far as I know. All states measure impairment with the stream condition index. Very similar and many more stringent than West Virginia's. There's nothing unusual about this. This is the way narrative, biological narrative standards are interpreted everywhere. And FOLA knows clearly that when it hits 68, it's done. It's in violation of the Clean Water Act. Without that, states can't protect the narrative, the floor of the narrative standards for water quality in their states. It's a critical part of what states do. And so I think that FOLA has known for a long time what would happen if it hits 68. It hits 68, and now it has to comply, and it's not happy about that. And I'd also say in terms of these numerical versus narrative criteria, going back to the Supreme Court case in PUD1 versus Washington Department of Ecology, the U.S. Supreme Court said in a similar situation, slightly different, but this is an older case, in a similar situation, petitioned, this is a quote from that case, petitioners assert, however, that Section 303 of the Clean Water Act requires states to protect designated uses solely through implementation of specific criteria. Through implementation, according to petitioners, the state may not require them to operate their dam in a matter consistent with a designated use. Instead, say petitioners under Section 303, the state may only require that the project comply with specific numerical criteria. We disagree, says the Supreme Court, with petitioners' interpretation of that language. It goes on to hold, we think that petitioners' attempt to distinguish between the criteria loses much of its force in light of the fact that the Act permits enforcement of broad narrative criteria based on, for example, aesthetics in that case. Now, that's a very broad criterion. Here we have a much more specific criterion, violation of a numerical biological water quality standard, violation of the whiskey. Can I go back to Trish? She has a question. Yes. So, I think that the gist of their argument is that we have these individual regulations of the effluent, and why do we, and if you have this general, you must maintain clean water, aren't those, isn't that simply duplicative? No, it's not duplicative because, let me try to explain it. So, the numerical criteria, like for iron or manganese, No, no, I understand real world why it's not duplicative, but if all the state is really concerned about are these things that are set forth, I guess what we're talking about is belts and suspenders, right? Sure. So, if that's the case, why doesn't every state have it this way? I don't know why every state doesn't have it this way, but I know that EPA, I mean, some do and some don't. All states are required. The EPA issues permits of its own in some cases. It does. And it puts this in some of them, many of them. I have right before me a provision from EPA, so this is something that EPA cited in its brief. It's a permit that it issued in New Hampshire, authorization to discharge under the NPDES system. There's a website in the brief that it submitted, and it says, this is the language from that very permit. The discharge shall not cause a violation of water quality standards of the receiving water. That's nearly identical to the language here. Listen to West Virginia's language. The discharge or discharges, again, same as the discharge, covered by an NPDES permit. Here it's a little wordy, but it says the same thing. Are not to be of such quality so as not to cause a violation of applicable water quality standards. That is the same thing as shall not cause a violation of water quality standards in the receiving water. West Virginia's provision is nearly identical to EPA's provision in its own permits. And EPA represents in its amicus brief that it has those often, frequently. It does. Okay. So to go back to the Supreme Court case that you talked about, it didn't involve this kind of provision, though. It was broad language, but it wasn't broad language. Yes. Well, it involved a narrative. So there are many kinds of narrative standards, right? So this is the most specific of the narrative standards, actually. I think it's for biological impairment. So that was an – it mentioned an aesthetic impairment, even that kind of thing. So the Supreme Court recognizes, as does the Ninth Circuit and many other cases that we cited, that you don't have to have numerical criteria. That a broad prohibition on violation of water quality standards is necessary to protect the flora. Without it, there's nothing states can do to stop waters from becoming impaired. And EPA required it. And EPA said most recently in the letter that it wrote to West Virginia objecting to a permit, it says the 2007 permit, and this is another SMAC permit, or Clean Water Act permit, just like the one at issue here, it says, incorporated by reference as a general condition of 47 CSR 30.5.1.F, which stated at the time, and then it states our provision, the discharge or discharges covered by the permit to be of such quality is not cause a violation of applicable water quality standards, end quote. And EPA says that incorporation by reference constitutes a water quality-based effluent limitation that, among other things, ensures the discharges will not cause or contribute to a violation of West Virginia's narrative water quality standard. Accordingly, the draft permit, which tries to take that out, is less stringent than the previous final permit, which incorporates by reference the narrative water quality requirement. And EPA objects to that permit and says you cannot issue that permit, West Virginia. EPA is the agency here who really has control and deserves deference because DP cannot issue a permit without EPA's approval. And EPA here will not allow the State of West Virginia to issue a permit without the provision in it that's at issue here today. And the reason it won't do it is because it says, West Virginia, if you do that, that will be backsliding and that violates the Clean Water Act. And it would allow impairment of West Virginia's streams, which violates everything in the Clean Water Act. Thank you very much. Thank you. You had a very nice long sentence. I didn't want to stop you in the middle of it. Your Honor, Your Honors, this reading of the condition in 5.1.F that OVAC advances eviscerates the permit shield. The permit shield is a critical component of the Clean Water Act. I hear some of the judges struggling with the fairness issue here. The permit shield is a fairness provision. The U.S. Supreme Court in DuPont v. Train said it gives permit holders finality. We don't have that here. Is there any argument that you didn't know about regulations of clean water? We understood water quality standards. This narrative standard is boundless, Your Honor. You knew what you had to do with respect to mine, right? No one could know that, Your Honor. No. So this whole 68, 62, you didn't know anything about that? We did know that was the standard that West Virginia measured water quality compliance with or narrowed standards with for some time. It has since dropped that standard. It has abandoned it. Judge Diaz asked, can they do that? Mr. Lovett said they cannot. They absolutely can. The WIVSKY standard, which was used. They abandoned it and EPA said it was fine? EPA has not said it is fine, but EPA does not get to decide. It is not a water quality standard. The WIVSKY is not something that's gone through rulemaking or ever been approved by EPA. West Virginia had every right to decide not to use the WIVSKY anymore. So when did they abandon it? In 2010, Your Honor. So before or after they joined this suit and used this provision? Before, Your Honor. Well, that's really interesting. I'm sorry. You're talking about the CONSOL suit, Your Honor. I thought you were talking about this suit. You're talking about the CONSOL suit. It would have been before the suit in 2011.  Well, what else would it have had to rely on something? Because the only way we could have recovered this one place was the provision that's at issue here. I think the – There wasn't anything – there weren't numeric limits for chloride with respect to one of these funds? I think there were numeric limits for chloride for all the mines, Your Honor. It says on paragraph 33 of the state's complaint that there weren't. I think there was a fish kill, Your Honor. These defendants were liable. I thought that this was offered – that the state backed its own complaint. Maybe we can – maybe your colleague can tell us. I think it was a Me Too complaint, Your Honor, frankly.  But I appreciate it. Thank you very much. Mr. Johnson, is it not in the complaint? I see it in the complaint, Your Honor. I do not know the history of that particular outlet. With respect to most of the outlets, there was an effluent limit, and this was something that – Right, but there wasn't with respect to that one, where they had a special count in the complaint relying on this provision of the permit that's at issue here. That may be, Your Honor. I don't have anything more on that outlet. Okay. A few other points. Regarding the 28-J letter that OVAC's counsel indicated, since the amendment that Judge Diaz discussed took effect and 5-1-F was removed from the regulations, over 200 permits have taken effect without EPA objection. There's only been one objection that's with respect to this particular letter that OVAC's counsel has referred to. And that, Your Honor, is a non-final letter. That is an invitation for DEP over the next 90 days to explain why that provision does not violate the OVAC statute. Do we have that somewhere in the record? I don't remember hearing this fact ever before. No, Your Honor. I'm making a representation based on my review of the 28-J letter that was filed last week. And so that is something that will continue as a dialogue between DEP and EPA. I thought in the record of this case, we have a fair amount of correspondence, a big record to be sure, but a fair amount of correspondence between the state and the Environmental Protection Agency about this provision and whether it is or is not properly in the permit and whether the state can or cannot remove it. Yes, Your Honor. But you're saying that EPA didn't make that objection with respect to any other permit. That is correct, Your Honor. It's this one permit, and this was a recent letter from the past. It was a very recent letter, Your Honor, after the record was closed. I'm talking about the record in this case with respect to the—not the recent letter, the record in this case about the correspondence between EPA and the state with respect to the provision that's at issue here. And EPA is saying, no, we're not going to approve this because you're trying to take this out. They have not made a final determination that, Your Honor, there is correspondence concerning prior legislative acts and what those meant, and there was a back and forth. I interrupted you. May I have a little more time? Of course. A couple other points. Judge Lee, there was no indication in the 19 sections, incorporated by reference in Section C of the permit or in any of the subparts of the WSGI standard. And Judge Diaz, you asked, could you simply have this broad narrative standard and nothing else? And the answer to that is, no, Your Honor. You need, for example, monitoring requirements to accompany that standard. In the NRDC case at the Ninth Circuit that OVEC relies on, it specifically says that the only way that narrative quality standard would be enforceable is if it was accompanied by monitoring requirements. Here, the monitoring requirements relate to the specific effluence, not to conductivity or to WSGI, which, by the way, in 2009 when this permit was pending, our Secretary went before Congress and said that they were not going to use WSGI as a standalone determinant for compliance with the water quality standards. And so the state of this was very much in flux at the time that this permit took effect. And finally, Your Honor, as EPA cites in its brief, Section 122.K, which is the provision that deals with when you can use a narrative water quality standard. It's only if numeric standards are infeasible or if you're adopting a best management practice, something like building a reservoir. It needs to be something concrete. And that is what preserves the permit shield as being something that provides fair notice at the time that the permit takes effect of what its obligations are. And that is why Congress put that in place to avoid this uncertainty as to what was causing downstream problems with water and what the permittee was obligated to do. Thank you very much. We will come down and say hello to the lawyers. And then we'll go directly to the next case.
judges: Diana Gribbon Motz, Albert Diaz, Gerald Bruce Lee